UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FEDERATED INDIANS OF GRATON RANCHERIA,<br><br>           Plaintiff,<br><br>      v.<br><br>UNITED STATES DEPARTMENT OF THE INTERIOR, et al.,<br><br>           Defendants. | Case No.  24-cv-08582-RFL<br><br>**ORDER DENYING KOI'S MOTION TO STAY PENDING APPEAL; ORDER GRANTING IN PART AND DENYING IN PART THE FEDERATED INDIANS OF GRATON RANCHERIA AND THE FEDERAL DEFENDANTS' CROSS-MOTIONS FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. Nos. 98, 115, 131 |

On January 13, 2025, the federal government took a 68.60-acre parcel of land (the "Shiloh Parcel") into trust for the benefit of Koi Nation ("Koi"), for a proposed casino project. The government further determined that gaming could be authorized on the land under the Indian Regulatory Gaming Act ("IGRA").  Another tribe, the Federated Indians of Graton Rancheria ("FIGR"), filed this lawsuit seeking to stop, and now reverse, the land-into-trust transaction. FIGR alleges that, among other things, it has ancestral ties to the Shiloh Parcel, and that the government railroaded FIGR and others in its decisionmaking process by failing to consider the historic preservation concerns and environmental impacts of the land-into-trust transaction, as required under federal law.  FIGR further alleges that the Department of Interior ("DOI") official who authorized the land-into-trust transaction and the gaming approval under IGRA lacked statutory authority to do so, and that DOI improperly concluded that Koi demonstrated the requisite significant historical connection to the Shiloh Parcel.  For the reasons stated below, FIGR's motion for summary judgment is **GRANTED**, and the Federal Defendants' cross-motion for summary judgment is **DENIED**, as to the claims that (1) the land-into-trust decision and

IGRA approval were undertaken without a valid delegation of statutory authority; (2) that the decision was made without adequately consulting FIGR under the National Historic Preservation Act ("NHPA") and thus without taking a sufficiently hard look at cultural resource impacts under the National Environmental Policy Act ("NEPA"); and (3) that DOI improperly concluded that Koi had the requisite significant historical connection to the Shiloh Parcel to apply the restored lands provision of IGRA.  As to the remaining claims, FIGR's summary judgment motion is **DENIED**, and the Federal Defendants' cross-motion is **GRANTED**.

## I.    BACKGROUND

Koi is a federally recognized tribe that, until January 2025, had no tribal lands in trust.  In 2021, Koi Nation submitted an application to the federal government, seeking to have land taken into trust for the purpose of opening a casino.  On May 27, 2022, DOI published a Notice of Preparation of an Environmental Assessment/Tribal Environmental Impact Report, which initiated a multi-year decisionmaking process to consider whether the land should be taken into trust and tribal gaming on the land should be authorized.  That process required DOI to scope alternative sites, consider the project's impacts on the environment and to historic properties, and to consult with third parties.  DOI issued its Final Environmental Impact Statement ("Final EIS") on November 22, 2024.

In response, FIGR filed this lawsuit on November 27, 2024, seeking a temporary restraining order preventing the Federal Defendants from taking the land into trust.  On December 20, 2024, the Court granted the temporary restraining order, finding that FIGR was likely to succeed on the merits of its case.  (Dkt. No. 30.)  However, on January 10, 2025, the Court denied FIGR's motion for preliminary injunction, on the basis that no irreparable harm would result from allowing the land to be taken into trust.  (Dkt. No. 52.)  The Court reached that conclusion, in part, because the Federal Defendants represented in their briefing and at the hearing that the land-into-trust transaction could be reversed, and that groundbreaking activities for the project were not expected to occur until the beginning of 2026, at the earliest.

On January 13, 2025, just one business day after the Court denied the preliminary

injunction and on the eve of the change in presidential administrations, the Federal Defendants issued a Record of Decision and accompanying Decision Letter for the project, taking the Shiloh Parcel into trust. The parties have cross-moved for summary judgment.

## II.    MOTION TO STAY

On July 24, 2025, Koi moved to stay further proceedings in this case,[1] pending the Ninth Circuit's resolution of its interlocutory appeal of the Court's prior order denying Koi's motion to dismiss for failure to join the tribe as an indispensable party. (Dkt. No. 131.) In its motion, Koi argued that the interlocutory appeal divested the Court of its jurisdiction or, in the alternative, that the Court should exercise its discretion to stay the case.

Koi's motion is denied. The prior order denying Koi's motion to dismiss is not appealable under the collateral order doctrine. "To qualify as a collateral order, a decision must: (i) conclusively determine the disputed question; (ii) resolve an important issue completely separate from the merits of the action; and (iii) be effectively unreviewable on appeal from a final judgment." *Stringfellow v. Concerned Neighbors in Action*, 480 U.S. 370, 375-76 (1987) (quotation omitted). Koi's appeal does not satisfy the third prong of the *Stringfellow* test. This issue was squarely decided in *Alto v. Black*, 738 F.3d 1111 (9th Cir. 2013). As the Ninth Circuit explained, "[c]ourts can, and do, effectively review and correct Rule 19 decisions" denying Rule 12(b)(7) motions to dismiss "after final judgment, including by ordering dismissal at that point of the lawsuit, as otherwise appropriate, if a required party cannot be joined." *Id.* at 1130 (collecting cases).

Koi correctly observes that the denial of a motion to dismiss on sovereign immunity grounds is immediately appealable. But this is not a situation in which Koi was "named as a party and then moved to dismiss the suit on grounds of tribal immunity." *Id.* Instead, as in *Alto*, Koi's "immunity argument is of a second order" because it would be reached only if Koi had

---

[1] Because Koi moved to stay the case just five days before the hearing on the cross-motions for summary judgment, the tribe did not move to stay the hearing. At the hearing on the cross-motions for summary judgment, the Court informed the parties that it would not issue a ruling on summary judgment until the motion to stay was decided.

been joined as an indispensable party. *Id.* Here, the prior order determined that Koi did not need to be joined under the public rights exception. (Dkt. No. 127.) Accordingly, "the sovereign immunity issue does not arise," and the appellate court "may not reach it, via the collateral order doctrine or otherwise." *Alto v. Black*, 738 F.3d at 1131. Thus, the "Rule 19 determination is not immediately appealable, because it can be reviewed after final judgment." *Id.* at 1130.

Because binding Ninth Circuit precedent holds that Koi's interlocutory appeal is premature and thus cannot be heard at this juncture, it does not provide a basis for staying the case. "[A] frivolous . . . appeal does not automatically divest the district court of jurisdiction." *Chuman v. Wright*, 960 F.2d 104, 105 (9th Cir. 1992) (citing *Apostol v. Gallion*, 870 F.2d 1335, 1339 (7th Cir. 1989)).

Moreover, the Court declines to exercise its discretion to stay the case. Koi has a substantial interest in continuing to pursue its gaming rights on its newly acquired trust lands. Yet, on the other hand, FIGR has a substantial interest in vindicating its rights to be consulted in the decisionmaking process, and in protecting its cultural and historical properties. The cross-motions for summary judgment are fully briefed and ripe for adjudication. In this posture, judicial efficiency and the parties' interest in moving the case forward to final disposition counsels in favor of deciding the cross-motions for summary judgment, which will allow all issues to be resolved on appeal at the same time. Accordingly, the motion to stay is denied.

## III.    CROSS-MOTIONS FOR SUMMARY JUDGMENT

FIGR and the Federal Defendants have cross-moved for summary judgment. For the reasons stated below, FIGR is entitled to summary judgment on its claims that (1) the land-into-trust decision and IGRA approval were undertaken without a valid delegation of statutory authority; (2) that the decision was made without adequately consulting FIGR under the NHPA and thus without taking a sufficiently hard look at cultural resource impacts under NEPA; and (3) that DOI improperly concluded that Koi had the requisite significant historical connection to the Shiloh Parcel to apply the restored lands provision of IGRA. The Federal Defendants are entitled to summary judgment on all remaining claims.

## A.     Legal Standard

The Administrative Procedure Act ("APA") controls judicial review of agency action.
Under the APA's deferential standard of review, an agency action may be set aside only if it is
"arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C.
§ 706(2)(A).  An agency action is arbitrary and capricious where "the agency has relied on
factors which Congress has not intended it to consider, entirely failed to consider an important
aspect of the problem, [or] offered an explanation for its decision that runs counter to the
evidence before the agency."  *Motor Vehicle Mfrs. Ass'n v. State Fam Mut. Auto. Ins. Co.*, 463
U.S. 29, 42 (1983).  The party challenging the agency's action carries the burden of persuasion.
*Ctr. for Cmty. Action & Env't Just. v. Fed. Aviation Admin.*, 18 F.4th 592, 599 (9th Cir. 2021).

"Summary judgment is an appropriate procedure for deciding challenges under the
APA."  *Natural Grocers v. Vilsack*, 627 F. Supp. 3d 1130, 1142 (N.D. Cal. 2022) (citation
omitted).  Summary judgment may be granted when there is no genuine issue of material fact
and the moving party is entitled to judgment of law.  "Because this is a record of review case, the
summary judgment motion will be decided upon a review of the administrative record as it
existed at the time of the agency's decision."  *Id.* (citing *Karuk Tribe of Cal. v. U.S. Forest Serv.*,
681 F.3d 1006, 1017 (9th Cir. 2012) (en banc) and *San Luis & Delta-Mendota Water Auth. v.
Jewell*, 747 F.3d 581, 602 (9th Cir. 2014)).  Reviewing the administrative record, the district
court "is to determine whether or not as a matter of law the evidence in the administrative record
permitted the agency to make the decision it did."  *Occidental Engineering Co. v. Immigr. &
Naturalization Serv.*, 753 F.2d 766, 769 (9th Cir. 1985).

## B.     Authority to Issue the Record of Decision and Decision Letter (Seventh Cause of Action)[2]

The Record of Decision and Decision Letter were signed by Director Tony Dearman of
the Bureau of Indian Education on January 13, 2025.  The power to acquire land into trust for the

---

[2] FIGR filed a case on February 14, 2025, *Federated Indians of Graton Rancheria v. Burgum et al.*, 25-
cv-01640-RFL, that was later consolidated into this action.  The numbering of the causes of action is
labeled according to the supplemental complaint filed in the later-consolidated action as to all claims,
except the NHPA claim, which is labeled according to the initial complaint filed in the original action.

benefit of Indian tribes under the IRA, 25 U.S.C. § 5108, and to make restored-land determinations under IGRA, 25 U.S.C. § 2719, rests with the Secretary of the Interior.  FIGR asserts a claim that Director Dearman did not possess statutory authority to take this administrative action, and thus, that the Record of Decision and Decision Letter must be vacated.

DOI designated a line of succession for Presidentially-appointed, Senate-confirmed positions pursuant to its 302 Departmental Manual 2.  In that manual, DOI established that "[i]n the event of a vacancy *or the absence of the incumbent* in a position covered by the Vacancies Act, the duties of the position shall be temporarily assumed by another individual serving in an acting capacity."  302 DM 2 at 1 (emphasis added).  Under DOI's succession memorandum, Position One was the Principal Deputy Assistant Secretary of Indian Affairs, Position Two was the Deputy Assistant Secretary of Policy and Economic Development, Position Three was the Director of the Bureau of Indian Affairs, and Position Four was the Director of the Bureau of Indian Education, which was Director Dearman.  AR 00004.  DOI's succession memorandum expressly states that "the authority of the Assistant Secretary may be exercised only when an official in one of the following positions is reasonably certain that no preceding official on the list is able to exercise that authority and when the *nature of the situation requires immediate action*."  AR 00003 (emphasis added).

The parties do not dispute that the officials occupying Positions One and Two were unable to act on the Record of Decision and Decision Letter because one official had left federal service and the other had recused himself.  However, FIGR argues that the administrative record does not establish that the official in Position Three was unavailable to rule on the Record of Decision and Decision Letter, or that the nature of the situation required immediate action.

The Federal Defendants do not contest that the administrative record fails to provide any support for the conclusion that the official in Position Three was unavailable or that the situation required immediate action.  Instead, the Federal Defendants rely on the presumption of regularity regarding its compliance with its own succession memorandum.  "The presumption of regularity supports the official acts of public officers and, in the absence of clear evidence to the contrary,

courts presume that they have properly discharged their official duties." *United States v. Chem. Found., Inc.*, 272 U.S. 1, 14-15 (1926); *see also Gov't of Guam v. Guerrero*, 11 F.4th 1052, 1058 (9th Cir. 2021) ("We have held that a public official is entitled to the presumption of regularity when there is some evidence that the public actor properly discharged the relevant official duties").

Even assuming the presumption of regularity applies, though, the administrative record rebuts the conclusion that the situation required immediate action. "The presumption of regularity [] is just that, a presumption." *Nat'l Treasury Emps. Union v. Trump*, 780 F. Supp. 3d 237, 254 (D.D.C. 2025). "Plaintiffs must present clear evidence to the contrary to rebut [it]." *Doe I v. Dep't of Homeland Security*, No. 20-cv-075157-BLF, 2021 WL 3402311, at *1 (N.D. Cal. Aug. 4, 2021); *see also Gov't of Guam*, 11 F.4th at 1058 (opposing party may rebut the presumption with "clear, affirmative evidence to the contrary").

The administrative record supports a clear inference that the situation did not require immediate action. DOI published its Notice of Preparation of an Environmental Assessment/Tribal Environmental Impact Report on May 27, 2022. As will be described in greater detail below, that initiated a multi-year decisionmaking process, in which DOI prepared an Environmental Assessment and Final EIS, ultimately issuing its Record of Decision and Decision Letter on January 13, 2025. This process required DOI to scope alternative project sites, conduct land surveys (carried out by archaeologists) to consider historic and cultural impacts, commission reports and studies to evaluate environmental impacts, and consult with third parties. In fact, the Final EIS "conservatively assumed" that phase one of the project construction would not begin until the beginning of January 2026, due to additional permitting that is required. AR 30854. (*See also* Dkt. No. 53 at 27 (government arguing at the preliminary injunction hearing that no irreparable harm is likely because groundbreaking activities will not occur until 2026).)[3] Thus, the Record of Decision and Decision Letter reflect the culmination of

---

[3] Citations to page numbers refer to the ECF pagination.

a years-long decisionmaking process of exactly the type where deliberation is often required, and expected.

The Federal Defendants offer no response to this record, other than their statement at the hearing that, "in order to have the Federal Register notice go out at the end of the week, [DOI] had to issue the decision on [January] 13th." (Dkt. No. 139 at 42.) However, there is no evidence or explanation as to why it was necessary that the Federal Register notice be posted that week. On this record, there was no urgency that provided the required basis to have Director Dearman, who appears to have had no involvement in the matter prior to when he issued the Record of Decision and Decision Letter, exercise the statutory authority delegated to the Secretary of the Interior. Accordingly, the determination to issue the Record of Decision and Decision Letter must be vacated as beyond Director Dearman's statutory authority.

### C.    FIGR's Other Challenges to the Record of Decision and Decision Letter for the Land into Trust Transaction

FIGR further asserts claims that, even if the land-into-trust transaction were properly authorized, the Record of Decision and Decision Letter violates the National Historic Preservation Act, the National Environmental Policy Act, and the Indian Reorganization Act. For completeness, each of those claims is addressed below.

#### 1.    The National Historic Preservation Act (First Cause of Action)

FIGR contends that DOI's approval of the Record of Decision and Decision Letter violated section 106 of the NHPA. Under section 106, an agency is required to consider a federal undertaking's effects on historic properties, including through consultation with any tribes that may "attach[] religious and cultural significance to [the] historic properties." 36 C.F.R. § 800.2(c)(2)(ii); *see also Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 805 (9th Cir. 1999) ("Section 106 of the NHPA is a stop, look, and listen provision that requires each federal agency to consider the effects of its programs" (quotation omitted)). Once a tribe has been recognized as one that may attach religious and cultural significance to historic properties that could be potentially affected, the tribe must be given a reasonable opportunity to

"identify its concerns about historic properties, advise on the identification and evaluation of historic properties, . . . articulate its views on the undertaking's effects on such properties, and participate in the resolution of adverse effects."  36 C.F.R. § 800.2(c)(2)(ii)(A).  The NHPA's implementing regulations state that "the agency official shall ensure that the section 106 process is initiated early in the undertaking's planning," and requires that, at the latest, it be completed "prior to the approval of the expenditure of any Federal funds on the undertaking or prior to the issuance of any license."  *Id.* § 800.1(c).

DOI did not meaningfully consult FIGR during its decisionmaking process, as is required under the NHPA.  On May 27, 2022, DOI published its Notice of Preparation of an Environmental Assessment/Tribal Environmental Impact Report, and set a June 27 deadline to submit comments on the appropriate scope of the environmental issues to be considered.  AR 23340.  Based on the scale of the proposed project, FIGR requested a public scoping hearing and that the deadline to submit comments be extended 30 days.  AR 23352.  That request was rejected.  On June 27, 2022, FIGR submitted comments which, among other things, "emphasize[d] the importance of considering cultural resources and proper National Historic Preservation Act (NHPA) review."  AR 23355.  In its letter, FIGR expressly stated that the Federal Defendants must "consult with the State Historic Preservation Office (SHPO) and [its Tribal Heritage Preservation Officer], including [in seeking] concurrence on the Area of Potential Effects (APE) and necessary identification and evaluation of cultural and historic resources and the project's impacts."  AR 23356.

By letter dated July 25, 2022, FIGR learned that two field surveys for the project were previously completed, without consultation of the tribe.[4]  AR 23359.  According to the letter, the studies "resulted in the discovery of several widely scattered artifacts and broken obsidian pieces of unknown origin."  AR 23359.  Because the origin of the artifacts was not readily determinable, the Federal Defendants explained that "[f]urther study [was] planned."  AR 23359.

---

[4] In reality, three studies had been conducted by this date.  However, FIGR did not learn of the third study until March 2023, as discussed in greater detail below.  AR 23319.

The section 106 consultation process had not yet been formally initiated at that time. FIGR responded to the letter on August 10, 2022, reiterating its request for consultation pursuant to section 106 of the NHPA and expressing concern that cultural resources were being studied and examined outside the formal consultation process. AR 23362.

On November 4, 2022, the Federal Defendants formally initiated the section 106 consultation process with FIGR. AR 23368. However, no meeting with FIGR was scheduled at that time, and on December 19, 2022, FIGR wrote again to reiterate its "request for copies of all records generated by the project proponent's archaeological consultant" in order to facilitate the tribe's ability to "meaningfully consult." AR 23370. Additionally, FIGR "strongly urge[d] that no testing of potential cultural resources be conducted without the participation and oversight of the culturally affiliated tribes to this project site, which include FIGR." AR 23370-23371.

On March 7, 2023, FIGR was informed that a total of four cultural resources investigations had already been conducted, all without notice to FIGR, and all before the formal section 106 consultation process was initiated. AR 23377. The studies were performed on February 17-20, 2022, on April 11, 2022, on May 3, 2022, and on August 3, 2022. AR 23319. The fourth study involved the collection of obsidian from the site that was sent to a laboratory for hydration testing—a type of destructive testing that requires cutting the artifact. AR 23319.

Due to communication issues, FIGR did not receive the reports created in connection with the four previously conducted investigations until July 3, 2023. AR 23320. As a result, on July 7, 2023, FIGR requested a few weeks to review the studies before providing a response. However, prior to receiving a response from FIGR, DOI issued its determination that no historic properties would be affected by the proposed project on July 18, 2023. AR 23320, 23382-23384. In its letter to the SHPO requesting concurrence on this finding, DOI explained that it had contacted several federally recognized tribes, including FIGR, about consulting in the section 106 process, and that it "reached out via email to each of these tribes on May 23, 2023, to confirm receipt of the reports and requested that any comments be forwarded [] no later than June 5, 2023." AR 23383. DOI further stated that as of the date of the letter, "there have been

no comments or other responses received from these tribes." AR 23384.

On August 7, 2023, FIGR wrote a letter identifying the tribe's concerns with the section 106 process, including DOI's failure to meaningfully consult with FIGR. AR 23386-23395. In that letter, FIGR specifically addressed each survey and report that was conducted without its participation. FIGR also explained that "of critical importance is the fact that without the involvement of FIGR or any culturally affiliated tribes, BIA lacked the requisite information to determine whether the Project Site is religiously and culturally significant." AR 23394. Thus, FIGR requested that DOI "rescind its initial determination and request for SHPO concurrence, and begin to engage in actual, meaningful consultation with the Tribe." AR 23395. Additionally, FIGR reiterated its request for a consultation meeting, further requested permission to conduct its own field survey and trenching, and requested that BIA perform additional studies at the project site, including a canine survey and ground penetrating radar survey. AR 23395.

After the SHPO reviewed DOI's request for concurrence, in addition to FIGR's letters (one sent directly to the SHPO and a copy of its letter sent to DOI), the SHPO explained that it "[could not] comment on the consultation of 18 July 2023 and request[ed] BIA to continue consulting with the FIGR, as well as with the other tribes who were contacted in BIA's Section 106 efforts, to further assess potential changes to the Area of Potential Effects (APE), the identification and evaluation of historic properties listed on or potentially eligible for listing on the National Register, and the effects determination." AR 23397. On August 24, 2023, DOI finally reached out to FIGR to schedule a meeting. AR 23400.

On November 30, 2023, a little over a year after the consultation process was formally initiated, FIGR met with DOI for the first time. In that meeting, FIGR reiterated its concerns about the section 106 process, requested copies of all cultural resource studies, and asked about the whereabouts of the artifacts that had been previously discovered by DOI. AR 23321. Just prior to that meeting, on November 13, 2023, FIGR also provided comments to DOI regarding the Environmental Assessment. AR 23402-23430.

Despite that meeting, on March 19, 2024, FIGR learned that a forensic canine survey had

been conducted on January 23-24, 2024—without prior notice to the tribe.  AR 23432.  In the email to FIGR, the archaeologist explained that the "survey produced several canine alerts that warrant further investigation," which was scheduled for April 2-3, and possibly extending to April 4, 2024.  AR 23432.  BIA invited FIGR to monitor the follow-up trench excavation work.  AR 23431.

FIGR responded on March 26, 2024.[5]  In its letter, FIGR explained that because BIA did not provide the tribe with enough time to review or consult on the further testing plan, nor had the tribe given its consent to excavate any burials, the April dates should be cancelled.  AR 23434.  Additionally, based on its review of the canine survey report, FIGR "flag[ged] the poor weather conditions at the time the [initial canine] survey was conducted."  AR 23434; *see also* AR 23435 ("As the report explains, there was rain, mud and standing water at the Project Site resulting from recent rains—conditions that limited the dogs' ability to access scent.").  It also explained that, given that the survey resulted in numerous canine alerts, notwithstanding the poor weather conditions, the results "confirm the concerns [FIGR] raised to the BIA throughout this Section 106 process, namely, that the Project Site is religiously and culturally significant and will be adversely affected by the proposed project."  AR 23435.

Thus, FIGR stated its belief that "BIA should commission a second canine study to be conducted when weather conditions are much more favorable," since BIA would not be able to "sufficiently determine where follow-up testing should be conducted without knowing the full extent of where human remains may be present."  AR 23435.  FIGR also requested that BIA notify the tribe and invite it to be present for any additional fieldwork, and asked that, after a more adequate canine field study is completed, BIA develop a written testing plan in consultation with the tribe (and any other section 106 consulting parties).  AR 23535.

On March 27, 2024, the archaeologist confirmed receipt of FIGR's letter but

---

[5] From the letter, it appears that the parties had a conversation over the phone regarding the March 19, 2024 email and the canine survey report, and that this letter was a follow-up to that conversation.  AR 23434.

communicated that the "work [would] proceed without further delay."  AR 23438.  Despite wet and muddy conditions, the trench excavation work proceeded as intended.  AR 23322.  Although FIGR's tribal monitor was in attendance, he was unable to enter the trenches for further investigation due to the wet conditions.  AR 23322.  On May 1, 2024, FIGR followed up with a letter, detailing its concerns about how the trench excavation work was performed.  AR 23441.  For example, FIGR explained that the BIA's own archaeological consultant "stated his concern with the muddy conditions of the Project Site after the recent rains and expressed his preference to have one or two more weeks of sun before proceeding; nonetheless, the work proceeded as scheduled."  AR 23442.  FIGR also noted that the archaeologist did not draw any trench profiles, spot-checked trench excavation and the spoils by hand (rather than screening any of the spoils), and spent less than half an hour on each trench.  AR 23442.  Additionally, with respect to the obsidian flake that was found in the spoils from Trench #6, FIGR explained that the BIA's archaeologist did not notice that cultural resource, but it was FIGR's monitor who found it instead.  AR 23442.  As a result, FIGR expressed its "concern[] that archaeological industry standards were not met in conducting this work," and more importantly, explained that based on the numerous methodological deficiencies identified by FIGR, that "the notion that BIA engaged in reasonable and good-faith efforts to identify historic properties, as required by the NHPA" was undermined.  AR 23442.

Without responding to FIGR, on May 6, 2024, DOI sought concurrence from the SHPO regarding its updated finding that no historic properties would be affected by the project.  AR 23454-23457.  On that date, DOI had not yet provided FIGR with a copy of the report on the trench excavation work, even though it was completed in early April.  AR 23323.  After receiving a copy of DOI's letter to the SHPO, FIGR wrote another letter to DOI, cc'ing the SHPO.  AR 23459-23461.  FIGR reiterated its position that "the pervasive and fundamental problems with the cultural resource investigations—including but not limited to the field surveys, canine study, and Phase I excavation work—undermine the notion that BIA engaged in reasonable and good-faith efforts to identify historic properties, including traditional cultural

properties, as required by the NHPA" and that "BIA's failure to provide [FIGR] with the requested documents or otherwise respond it [its] questions falls far short of the BIA's duty to engage in meaningful consultation."  AR 23460.

On July 10, 2024, the SHPO responded to DOI, finding that "the efforts to identify historic properties, including those of religious and cultural significance to Tribes to be insufficient, inadequate, and not reasonable."  AR 23466-23468.  As a result, the SHPO requested that BIA reinitiate section 106 consultation with FIGR, other consulting tribes, and the SHPO "by redefining the APE in a manner that considers the geographic area . . . within which the undertaking may directly or indirectly cause alterations in the character or use of historic properties and consult on the efforts it proposes to identify historic properties within the APE." AR 23468.

Based on the SHPO's recommendation, FIGR wrote to DOI on July 22, 2024, attempting to reinitiate the consultation process.  AR 23470-23472.  However, DOI never reinitiated consultation, and on November 22, 2024, the agency issued its Final EIS.  In its Final EIS, the agency stated that it "carried out efforts pursuant to [the NHPA]," including by "gathering information from Indian Tribes to assist in identifying properties which may be of religious and cultural significance."  AR 30935.  DOI reiterated its finding that no historic properties would be affected by the proposed project.  AR 30935.

As the record reflects, FIGR was not meaningfully consulted during the section 106 process.  FIGR lacked a meaningful opportunity to "articulate" its views before DOI made up its mind.  36 C.F.R. § 800.2(c)(2)(ii)(A).  Although the formal consultation process was initiated in November 2022, it took over a year for DOI to finally meet with FIGR.  By that point in time, DOI had already once issued a determination that no historic properties were affected and had attempted to receive concurrence from the SHPO.  The Federal Defendants argue that once consultation was re-initiated, FIGR was provided an opportunity to meaningfully consult with DOI before the agency repeated its finding that no historic properties were affected.  However, DOI's only substantive engagement with FIGR's criticisms regarding the canine survey occurred

on December 30, 2024, after this litigation had commenced.  AR 23589.  During that call, DOI

met with the experts who conducted the canine survey, but it was summarily stated on the call

that no further surveys were warranted, without true engagement with FIGR's criticisms.  AR

23589-23590.  Moreover, DOI does not appear to have responded to or engaged with FIGR's

expert archaeologist Alex DeGeorgey's report.  AR 23576.  Additionally, FIGR was not given a

meaningful opportunity to "advise" DOI about its potential historic properties on the Shiloh

Parcel.  DOI conducted multiple surveys without providing notice to the tribe, and even at the

final trench excavation where FIGR's tribal monitor was present, the monitor was unable to enter

the trenches himself due to the work being performed under poor weather conditions.

DOI railroaded the tribe at every turn.  Although there is no requirement that the agency

respond to every comment from FIGR, or that it change its position to conform to the

preferences of the tribe, the record here supports the inference that the agency had already made

up its mind prior to receiving FIGR's input.  The lack of any substantive engagement with

FIGR's comments, coupled with the history of attempts to avoid any real consultation with

FIGR, indicates a lack of meaningful consultation.  This is insufficient to satisfy the consultation

requirement under section 106 of the NHPA, and FIGR is entitled to summary judgment on this

claim as a result.

### 2.    The National Environmental Policy Act (Fifth and Sixth Causes of Action)

Notwithstanding DOI's failure to meaningfully consult FIGR—as was required under

section 106 of the NHPA—the agency's process otherwise satisfied the requirements under

NEPA.  FIGR argues that the Final EIS was inadequate under NEPA because the Federal

Defendants (1) failed to evaluate reasonable alternatives and (2) failed to take a "hard look" at

the environmental impacts of the proposed project.  However, the undisputed record shows that

the Federal Defendants satisfied both of those requirements.

### a.    The Federal Defendants adequately considered alternatives.

NEPA requires agencies to consider a "reasonable range of alternatives to the proposed

agency action." 42 U.S.C. § 4333(C). "The range of alternatives that an agency must consider under NEPA is based on the purpose and need of the proposed agency action." *Audubon Soc'y of Portland v. Haaland*, 40 F.4th 967, 981 (9th Cir. 2022) (citing *Westlands Water Dist. v. Dep't of Interior*, 376 F.3d 853, 865 (9th Cir. 2004)). Here, DOI defined the purposes and needs of the proposed action as "facilitat[ing] tribal self-sufficiency, self-determination, and economic development" in order to satisfy the agency's land acquisition policy. AR 30782. The agency's articulation of the purposes and needs of the proposed action was reasonable, and FIGR does not argue otherwise.

Instead, FIGR argues that DOI failed to consider a reasonable range of alternatives, including a site within Lake County, where Koi's ancestral homelands are located. As the party challenging the agency's failure to consider an alternative, FIGR carries the burden "to show that the alternative is viable." *Alaska Survival v. Surface Transp. Bd.*, 705 F.3d 1073, 1087 (9th Cir. 2013). Moreover, "[a]n agency is under no obligation to consider every possible alternative to a proposed action, nor must it consider alternatives that are unlikely to be implemented or those inconsistent with its basic policy objectives." *HonoluluTraffic.com v. Fed. Transit Admin.*, 742 F.3d 1222, 1231 (9th Cir. 2014) (quoting *Seattle Audubon Soc'y v. Moseley*, 80 F.3d 1401, 1404 (9th Cir. 1996)). Rather, "[t]he agency must at least consider a 'preferred' alternative and a 'no action alternative, and 'give full and meaningful consideration to all *reasonable* alternatives.'" *Earth Island Inst. v. U.S. Forest Serv.*, 87 F.4th 1054, 1065 (9th Cir. 2023) (quoting *W. Watershed Project v. Abbey*, 719 F.3d 1035, 1050 (9th Cir. 2013)). "The agency must also 'briefly discuss' the reasons why it eliminated any alternatives from a detailed study." *Klamath Forest All. v. U.S. Forest Serv.*, 746 F. Supp. 3d 761, 769 (N.D. Cal. 2024) (quoting 40 C.F.R. § 1502.14(a) (2020)).

"Judicial review of the range of alternatives considered by an agency is governed by a rule of reason that requires an agency to set forth only those alternatives necessary to permit a reasoned choice." *HonoluluTraffic.com*, 742 F.3d at 1231 (quotation omitted). In the Environmental Assessment, DOI considered but ultimately eliminated from further consideration

off-site alternatives because Koi "does not own, nor does it have an option to own, an off-site property that would be suitable for the proposed project." AR 23256. DOI stated that it had considered potential "alternative sites identified by the public." AR 20487. However, the agency explained that it was "highly speculative" whether Koi "would be able to purchase an alternative site that could be developed with an economic enterprise with which to fund the tribal government." AR 20488. DOI determined that consideration of such a speculative alternative would not "promote[] informed decision-making," because "the financial benefits of developing such a site" would be based on "speculation," as would the question of whether "the Tribe would be able to purchase said site." AR 20488. An agency is under no obligation to consider every alternative—especially those that are administratively infeasible—and FIGR has failed to show that the alternative it proposes is viable. In sum, DOI's justification for why it eliminated off-site alternatives is reasonable.

Given the agency's stated purpose, DOI considered a reasonable range of alternatives. In the Final EIS, DOI considered the proposed resort and casino project, a reduced intensity resort and casino project, a non-gaming winery resort, and a no action alternative. That is more than sufficient under NEPA.

> **b.    The Federal Defendants satisfied the hard look standard.**

DOI adequately considered the environmental impacts of the proposed action (except as to the impact on cultural resources for the reasons explained above in Part III.C.1). "NEPA requires agencies to take 'a "hard look" at the likely effects of the proposed action,' including all foreseeable direct, indirect, and cumulative impacts." *Klamath*, 746 F. Supp. 3d at 772 (citing *Ctr. for Biological Diversity v. Salazar*, 695 F.3d 893, 916-17 (9th Cir. 2012)). "To satisfy the 'hard look' requirement, an agency must provide a reasonably thorough discussion of the significant aspects of the probable environmental consequences." *350 Montana v. Haaland*, 50 F.4th 1254, 1265 (9th Cir. 2022) (quotations omitted). An agency "is only required to focus on the issues that are truly significant to the action in question" and the impacts need only be discussed "in proportion to their significance." *Hapner v. Tidwell*, 621 F.3d 1239, 1245 (9th Cir.

2010) (quotations omitted). Courts "employ a rule of reason," rather than "fly-speck" the agency's analysis or "act as a type of omnipotent scientist," when reviewing an agency decision to determine whether the hard look standard was satisfied. *Audubon Soc'y of Portland*, 40 F.4th at 984 (quotations omitted). "[A]n agency is entitled to wide discretion in assessing the scientific evidence, . . . [and] courts must defer to the informed discretion of the responsible federal agencies." *Earth Island Inst. v. U.S. Forest Serv.*, 351 F.3d 1291, 1301 (9th Cir. 2003).

For the reasons explained in Part III.C.1, DOI failed to take a hard look at the impact on cultural resources. Without proper consultation from FIGR and other tribes, DOI was unable to consider significant aspects of the issue. Thus, the agency failed to satisfy the hard look standard.

However, DOI did take a hard look at the wildfire and evacuation risks associated with the project. With respect to the construction process, DOI concluded that the project would not unsafely increase wildfire risk if best management practices were implemented, including by preventing fuel from being spilled and putting spark arresters on equipment. AR 31000. DOI also considered how the project would affect wildfire risk and evacuation capabilities in the area. To address these issues, DOI conducted an Evacuation Travel Time Assessment ("ETTA"), modeled based on the 2017 Tubbs Fire and 2019 Kincade Fire, which both occurred in the area. In its Final EIS, DOI acknowledged that one potentially significant impact of the project would be an increase in evacuation times in the area, especially as reflected under the most conservative models. AR 31003. To address any potential impacts, DOI expressly considered the various options for mitigation plans. FIGR has not demonstrated that DOI's analysis was unreasonable.

DOI also adequately considered the project's impacts on traffic patterns. The Final EIS found that congestion on Shiloh Road and at certain turn lanes would be significantly impacted by the project, while other roads would remain at an acceptable level. Its findings were based on a traffic study the agency conducted using existing average daily traffic volumes and studies for similar tribal casino resorts in Northern California. AR 30953. To mitigate those impacts, DOI considered possibilities such as requiring Koi to make fair share contributions to improvements

that could address the impacts to the local community.

With respect to potential land use conflicts, the agency sufficiently considered the issue. The Final EIS engaged with the fact that the proposed project was inconsistent with the state and local zoning restrictions for the site, and that the casino project could affect air quality, noise levels, and visual effects. AR 30964. However, the Final EIS concluded that the project would not be overly disruptive to the area and was consistent with other commercial uses in the area. That is sufficient to satisfy the hard look standard.

Finally, DOI satisfied the hard look standard with respect to the potential impacts on groundwater and wastewater. The agency conducted a water and wastewater feasibility study and supplemental groundwater resources impact assessment. With respect to groundwater, DOI addressed the fact that the site's soil has slow infiltration and high runoff potential. AR 30889. The agency considered bioswales and a detention basin, and analyzed whether four additional wells could mitigate the potential groundwater issues. With respect to wastewater, the project includes a wastewater treatment plan. The Final EIS also noted that treated wastewater may be able to be discharged, subject to a national pollutant discharge eliminating system permit. That is sufficient.

### 3.    The Indian Reorganization Act (Fourth Cause of Action)

FIGR also asserts a claim that DOI's decision to take the Shiloh Parcel into trust under the IRA should be vacated for failure to consider "jurisdictional problems and potential conflicts of land use which may arise," as required under the regulations. 25 C.F.R. § 151.10(f) (1995). FIGR further contends that, because the distance between the project site and Koi's reservation was approximately 55 miles, other interests should have been given greater weight. *See* 25 C.F.R. § 151.11(b) (1995) ("[A]s the distance between the tribe's reservation and the land to be acquired increases, the Secretary shall give greater scrutiny to the tribe's justification of anticipated benefits from the acquisition" and "shall give greater weight to the concerns raised" by state and local governments). However, the regulations were amended on December 12, 2023, to no longer expressly require that those factors be considered, or that the distance between

the site and tribal reservation should trigger a sliding scale approach to evaluating competing interests.  "[A] reviewing court must apply 'the law in effect at the time it renders its decisions, even when a change in governing law is made by an administrative agency.'"  *Morales de Soto v. Lynch*, 824 F.3d 822, 826 (9th Cir. 2016) (quoting *Panhandle E. Pipeline Co. v. FERC*, 890 F.2d 435, 438-39 (D.C. Cir. 1989)).

In any event, even assuming that DOI was required to expressly consider distance, jurisdictional problems, and land use conflicts, the agency has adequately done so.  *See, e.g.*, *Lincoln City v. Dep't of Interior*, 229 F. Supp. 2d 1109, 1125 (D. Ore. 2001) (explaining that DOI does not need to "resolve all potential [jurisdictional] issues," just consider them).

With respect to the distance analysis, Dearman determined that Koi "has no reservation or trust land," AR 00025, and there is no allegation or evidence to the contrary.  *See* 25 C.F.R. § 151.2 (defining "reservation" as "land over which the Tribe is recognized by the United States as having governmental jurisdiction").  Accordingly, 25 C.F.R. § 151.11(b)'s requirement to consider various factors based on the "distance from the reservation" is inapplicable.  And it is undisputed that DOI did discuss more generally Koi's connection to lands near the Shiloh Parcel. *See, e.g.*, AR 00025.

With respect to potential land use conflicts, the Record of Decision and Decision Letter briefly addressed the issue and incorporated by reference the more fulsome reasoning contained in the Final EIS.[6]  It explained that even though the proposed project is inconsistent with current state and local land use and zoning designations, that would no longer be true once the land was taken into trust—because only federal and tribal land use regulations would apply at that point. AR 00033.  Additionally, as explained by the Final EIS, the proposed project site is surrounded by a mobile home park, residential subdivisions, rural residential housing and agriculture, a church, commercial buildings, and an RV storage yard.  Therefore, the Final EIS concluded that

---

[6] The Decision Letter specifically cited to the Final EIS.  AR 00033 n.135.  This reflects an intent to incorporate by reference the Final EIS's reasoning.  Therefore, in arguing a position it stated in the Final EIS, the agency is not offering a post-hoc rationalization.

the proposed project "would not physically disrupt" neighboring land uses or prohibit access to neighboring parcels. AR 30962-30964. That is sufficient consideration of the issue to render the decision neither arbitrary or capricious.

With respect to jurisdictional problems, the Record of Decision and Decision Letter considered whether issues would be created under Public Law 83-280. As it explained, "[p]lacing the Shiloh Site in trust will not create jurisdictional problems" because once the parcel is accepted into trust, "the State of California will have the same territorial and adjudicatory jurisdiction over the land, persons, and transactions on the land as the State has over other Indian lands within the State." AR 00033. Additionally, the Decision Letter noted that Koi already signed a letter of intent with the Sonoma County Fire Department demonstrating their "intent to enter into a memorandum of understanding that will include an agreed upon rate that the Tribe will pay to the Fire District in exchange for fire protection services at the gaming facility." AR 00033. FIGR protests that DOI failed to consider the jurisdictional impact of placing land into trust that might contain FIGR cultural resources and remains in Koi's control. However, the record shows that DOI discussed that concern and adopted mitigation measures designed to protect FIGR's and other tribes' consultation rights upon discovery of remains or cultural resources. AR 18101-18102. The rights provided by those measures mirror the tribes' existing consultation rights under state law. (Dkt. No. 52 at 13 (describing FIGR's consultation rights under state law).) Thus, the Federal Defendants are entitled to summary judgment on this issue.

### D. FIGR's Other Challenges to the Decision Letter Under the Indian Gaming Regulatory Act (First Cause of Action)

FIGR further challenges DOI's determination that the Shiloh Parcel qualifies as restored lands under IGRA. As a general rule, IGRA bars gaming on lands taken into trust after October 17, 1988. However, IGRA's prohibition does not apply to lands taken into trust as part of "the restoration of lands for an Indian tribe that is restored to federal recognition." 25 U.S.C. § 2719(b)(1)(B)(iii). Under DOI's implementing regulations, to qualify for the "restored lands" exception, it must be shown that the tribe has a modern, temporal, and significant historical

connection to the land. 25 C.F.R. § 292.12.

Under the restored lands exception, "a significant historical connection to the land" *itself* must be established. *Id.* 292.12(b). To demonstrate such a connection, the land must be "located within the boundaries of the tribe's last reservation under a ratified or unratified treaty" or a tribe must "demonstrate by documentation the existence of the tribe's villages, burial grounds, occupancy or subsistence use in the vicinity of the land." *Id.* § 292.2. DOI has interpreted the term "vicinity" to mean "those circumstances of use and occupancy leading to the natural inference that the tribe also made use of the *parcel* in question." *Confederated Tribes of Grand Ronde Cmty. of Or. v. Jewell*, 830 F.3d 552, 566 (D.C. Cir. 2016) (cleaned up) (emphasis added).

It is undisputed that the Shiloh Parcel is located outside the boundaries of Koi's last reservation. Thus, to establish a significant historical connection to the land, Koi was required to satisfy the vicinity test. DOI relied on evidence of Koi's trade routes, seasonal labor patterns, burial sites, and the relocation of the tribe's leader (and the de facto tribal headquarters) to areas near the Shiloh Parcel to support its conclusion that Koi had a significant historical connection to the land. However, the documentation submitted by Koi establishing its historical connection to the area does not give rise to the natural inference that the tribe made use of the Shiloh Parcel itself. Accordingly, the record does not support DOI's determination that Koi has a significant historical connection to the site itself, or its conclusion that IGRA's restored lands exception applies.

The record shows that Koi used trade routes across the Russian River Valley and out to the Pacific Coast. AR 28805; *see also* AR 28827 ("The seasonal migration of Pomo workers followed traditional trade routes through their homelands and brought them to Windsor, Healdsburg, Sebastopol, and Santa Rosa."). For example, "Coast Miwok to the south and the Southern Pomo allowed Koi people transit through their lands to Bodega in order to gather clams [], the raw material for clamshell currency." AR 28806. "The journey to Bodega Bay took three and one-half days, passing through Cloverdale and Sebastopol. The travelers made their last night's camp at Sebastopol before reaching the coast. An alternative route went directly south

from Lower Lake along what became Highway 29 to Calistoga." AR 28806. As the report explains, an owner of a redwood tree farm along the route to Santa Rosa reported that "Pomo used the area extensively as a campground when they engaged in trade with visitors from Lower Lake." AR 28806. At least one trade route from Lower Lake out to Bodega Bay passed right by the Shiloh Parcel. AR 27883. (*See also* Dkt. No. 137-2 ("FIGR's pre-1900 Demonstrative").) These trips continued into the 20th century.

The earliest historical evidence of Koi's presence in the southern Russian River Valley is its trade routes. However, this evidence, on its own, is insufficient to establish a significant historical connection to the Shiloh Parcel itself. As the D.C. Circuit explained in *Confederated Tribes of Grand Ronde Community of Oregon v. Jewell*, 830 F.3d 552 (D.C. Cir. 2016), the agency has taken the position in interpreting its own regulations that trade route or trading activities "have to be substantial enough" to establish that a tribe had "more than a transient presence in the area." *Id.* at 568 (quotation omitted). This requires "something more than evidence that a tribe merely passed through a particular area." *Id.* (quoting an agency opinion). While there is evidence in the record that Koi passed through the Windsor area in traveling to Bodega Bay, that does not give rise to an inference that the tribe had a substantial presence in the area at the time.

DOI also relied on evidence that Tom Johnson—the tribe's "Captain" or chief—relocated to the southern Russian River Valley at the beginning of the 20th century, about 12 miles south of the Shiloh Parcel. By 1918, several members of the Johnson family had permanently resettled at the new location in Santa Rosa, due to the Lower Lake Rancheria being rendered partially uninhabitable after a dam was built. AR 28762-28763. Tom Johnson's residence "became a de facto tribal headquarters for the Koi." AR 28763. "While many Koi continued to live at Lower Lake in Lake County, the Johnson relocation . . . established a permanent presence in the Russian River Valley that has continued to the present." AR 28763; *see also* AR 28850 ("The Johnson home became a meeting place for Koi and other Indian leaders as Tom Johnson became by the 1920s a leader among Indians in northern California."). For "[m]embers of the Koi Nation who

23

were annually involved in the agricultural harvests in the Russian River Valley," the Johnson residence became a gathering place during the season.  AR 28830.  Additionally, "[t]he younger generation born after 1910 identified birthplaces at Analy and Sebastopol in Sonoma County where their families found employment in the orchards of the Russian River Valley."  AR 28874.

Koi's use of the Johnson residence in that era, however, does not give rise to a natural inference that Koi used the Shiloh Parcel itself.  Crucially, the Shiloh Parcel was privately owned from 1880 to 1994.  The fact of private ownership significantly undercuts the natural inference that tribal members passed through the land or used it in connection with their activities at the Johnson residence.  Indeed, the fact that the Johnson residence operated as the de facto political headquarters would appear to make it less likely that Koi tribal members were using other locations in the area, such as the privately owned Shiloh Parcel, as informal gathering sites.

For the same reason, DOI's reliance on the burials of some Koi tribal members in Sonoma County generally does not provide a basis to infer that the members were using the Shiloh Parcel.  The census data and burial records reflect that Koi tribal members migrated to Sonoma County, although even in 1940, a majority of the tribal members still lived in Lake County.  *See* AR 28896-28897.  Of those who permanently resided in Sonoma County, most (if not all) appear to be the immediate family or descendants of Tom Johnson.  AR 28895-28896.  That tribal members lived and died in Sonoma County generally does not give rise to a natural inference that they used the privately owned Shiloh Parcel.

DOI did note that Koi's migratory labor patterns brought its members to the fields, farms, and orchards in the Russian River Valley area generally.  However, none of the evidence in the record ties Koi to farms or fields on or near the Shiloh Parcel.  In the 1850s, as more Euro-Americans established farms and towns near Clear Lake Basin, "the Indians were driven from the islands in Lower Lake and compelled to exist as squatters on the farms."  AR 28849.  Faced with accelerating population loss, "the Koi Pomo became common laborers" to survive.  AR 28849-28850.  "Following their traditional seasonal trading routes, they found employment in agricultural work to plow, plant, prune, and harvest.  They worked throughout the Russian River

Valley to pick apples, pears, hops, and grapes.  By the 1870s and continuing for decades they became an integral part of the agricultural labor force of Sonoma, Lake, and Mendocino counties."  AR 28850.  In one article, the "1901 Lower Lake Indians were singled out by the newspaper in Cloverdale as they returned from picking hops and grapes," and were described as "nearly all good farmers."  AR 28829.

As another historian explained, the Koi "entered into the regional, rural economy.  They traveled from farm to farm engaged in haying and harvest.  Hop-picking became an important part of labor and survival for several villages.  Pomo were integral workers in the Russian River hop fields starting in the 1870s."  AR 28719; *see also* AR 28827.  The historian also quoted an observer who, in 1883, noted that "[a]s the month of hop-picking approaches, the remnants of every tribe within a hundred miles of the Russian River straggle into the opulent valley . . . . They select their camps where they have access to water and woods, their only shelter from the chilly nights being a primitive hut of canopy of willow brush."  AR 28719; *see also* AR 28829.

To amount to a significant historical connection, evidence of subsistence use and occupancy must be substantial enough to give rise to a natural inference that the tribe used the land at issue.  According to census data from 1880, there were only 43 Lower Lake Pomo Indians in the area, presumably only some of which participated in seasonal labor in the Russian River Valley.  AR 28876.  Nor is there a basis to infer that these individuals ever worked on or near the Shiloh Parcel itself.  Reports tie at least some of those seasonal laborers to the Cloverdale area, with the rest of the reports describing the seasonal labor patterns across the entire valley region.

Furthermore, even assuming it could be reasonably inferred that Koi tribal members occasionally worked as seasonal farm laborers on the Shiloh Parcel, seasonal labor on the land is insufficient to establish the requisite *significant* historical connection to the land.  Such a connection requires evidence that "the parcel was of historic, economic, and cultural significance" to Koi.  *See e.g.*, *Grand Traverse Band of Ottawa & Chippewa Indians v. U.S.*

*Att'y for W. Dist. of Mich.*, 198 F. Supp. 2d 920, 936 (W.D. Mich. 2002). That Koi laborers may have passed through and worked on the land as one of numerous farms throughout the Russian River Valley area is an insufficient basis on which to draw that inference.

In sum, the record does not support DOI's conclusion that Koi established a significant historical connection to the Shiloh Parcel, such that IGRA authorized gaming on the land under the restored lands exception. FIGR is entitled to summary judgment on this claim.[7]

## IV.    CONCLUSION

Based on the foregoing reasons, Koi's motion to stay is denied.

Additionally, FIGR is entitled to summary judgment on its claims that (1) the land-into-trust decision and IGRA approval were undertaken without a valid delegation of statutory authority; (2) that the decision was made without adequately consulting FIGR under the NHPA and thus without taking a sufficiently hard look at cultural resource impacts under NEPA; and (3) that DOI improperly concluded that Koi had the requisite significant historical connection to the Shiloh Parcel as to apply the restored lands provision of IGRA. The Federal Defendants are entitled to summary judgment as to all remaining claims. It is, therefore, adjudged that this matter is remanded to the Department of Interior, with vacatur of the Record of Decision and Decision Letter, to comply with the Court's order.

The parties shall meet and confer and jointly propose a form of final judgment that reflects this order by no later than **September 16, 2025**.

**IT IS SO ORDERED.**

Dated: September 2, 2025

RITA F. LIN
United States District Judge

---

[7] Because this order finds that DOI's application of the restored lands exception to the Shiloh Parcel was not supported by the record, the Court does not reach FIGR's additional arguments that DOI's application of that exception rested on an invalid interpretation of DOI's regulations (Second Cause of Action) or violated the IRA's Privileges and Immunities Clause (Third Cause of Action).